**This order is SIGNED.**



**Dated: September 13, 2017** _____



**R. KIMBALL MOSIER**
**U.S. Bankruptcy Judge**

---

## IN THE UNITED STATES BANKRUPTCY COURT

## FOR THE DISTRICT OF UTAH

| | |
|---|---|
| In re: | Bankruptcy Number: 08-20105 |
| C.W. Mining Company, dba Co-Op Mining Company, | Chapter 11 |
| | Hon. R. Kimball Mosier |
| Debtor. | |
| Rhino Energy LLC and Castle Valley Mining LLC, | Adversary Number: 11-2250 |
| Plaintiffs, v. | |
| C.O.P. Coal Development Company and ANR Company, Inc., | |
| Defendants. | |

---

### MEMORANDUM DECISION

---

Rhino Energy LLC and Castle Valley Mining LLC (collectively "Rhino") have moved for summary judgment on Count VI of their Second Amended Complaint (Count VI) and on the twenty-two counterclaims (Amended Counterclaims) filed by Defendants C.O.P. Coal

Development Company (COP) and ANR Company, Inc. (ANR). Rhino is asking for a judgment declaring that COP and ANR are estopped from asserting breach of contract claims based on Rhino's coal mining methods and plan, which have been approved by the United States Department of Interior, Bureau of Land Management (BLM).

## I. JURISDICTION

The issues in this case center on the assumption and assignment of C.W. Mining Company's (Debtor) rights and interests under certain real property leases (Coal Operating Agreements) with COP and ANR. The Coal Operating Agreements granted the Debtor the exclusive right to operate and mine certain federal and private coal reserves known as the Bear Canyon Mine. The Debtor's rights and interests were assigned to Rhino pursuant to this Court's Order Authorizing Sale of Mine Assets Free and Clear of All Liens, Claims, Encumbrances, and Interests and Authorizing the Assumption and Assignment of Executory Contracts Under 11 U.S.C. §§ 363 and 365 (Final Sale and Assignment Order). The Court originally exercised jurisdiction over the assignment of the Coal Operating Agreements under 28 U.S.C. §§ 157 and 1334 and 11 U.S.C. §§ 105, 365, and 541. In the Final Sale and Assignment Order, this Court retained jurisdiction to decide any disputes regarding the Final Sale and Assignment Order, including all issues and disputes arising in connection with the relief authorized therein.

This Court previously dismissed Counts III through VI of Rhino's complaint, finding that it lacked jurisdiction to adjudicate Rhino's alleged defaults that occurred after the Coal Operating Agreements had been assigned to Rhino. This Court's reasoning is set forth in its memorandum decision dated September 30, 2013, but essentially this Court took a narrow view of its

jurisdiction over post-assignment lease disputes and was of the opinion that those disputes should

be determined by non-bankruptcy courts.

Rhino appealed this Court's ruling that it lacked jurisdiction to adjudicate Counts III

through VI to the District Court for the District of Utah. In its decision dated July 10, 2015

(Remand Order), the District Court disagreed with this Court's narrow view of its jurisdiction

and concluded that this Court retained jurisdiction to adjudicate Counts III through VI in this

adversary proceeding. The District Court found that this Court's orders set the standard for future

compliance with the Coal Operating Agreements and remanded the case to this Court to

complete its consideration of Rhino's motion for partial summary judgment. Because Rhino

relied on those orders when it acquired the Debtor's rights in the Coal Operating Agreements, the

District Court concluded that this Court retains jurisdiction to enforce that standard and protect

Rhino's rights.

Therefore, based on this Court's original jurisdiction over the assumption and assignment

of the Coal Operating Agreements pursuant to the provisions of 28 U.S.C. §§ 157 and 1334 and

11 U.S.C. §§ 105, 365, and 541,[1] this Court's retention of jurisdiction under the Final Sale and

Assignment Order and the District Court's Remand Order, this Court has jurisdiction over Count

VI and the Amended Counterclaims. Count VI is properly raised under 28 U.S.C. § 2201, which

allows "any court of the United States . . . [to] declare the rights and other legal relations of any

interested party seeking such declaration[.]"

---

[1] All subsequent statutory references are to title 11 of the United States Code unless
otherwise indicated.

## II. FACTUAL AND PROCEDURAL BACKGROUND

Coal mining, particularly mining of federal coal reserves, is a heavily regulated industry.

Before conducting any mining operation on federal leases, the operator/licensee must submit and

obtain approval of a resource recovery and protection plan (R2P2).[2] An R2P2 is a plan showing

that the proposed operation meets the requirements of the Mineral Leasing Act (MLA)[3] for

development, production, resource recovery and protection, diligent development, continued

operation, maximum economic recovery (MER), and other federal regulations, for the life-of-the-

mine.[4] To promote the MER of federal coal reserves, the BLM may approve the consolidation of

federal coal leases into a Logical Mining Unit (LMU). An LMU is an area of land in which the

coal resources "can be developed in an efficient, economical, and orderly manner as a unit with

due regard to conservation of . . . coal reserves and other resources."[5] "An LMU may consist of

one or more Federal leases and may include intervening or adjacent lands in which the United

States does not own the coal [resources]."[6] But all the lands in an LMU must "be under the

effective control of a single operator/lessee, be able to be developed and operated as a single

---

[2] 43 C.F.R. § 3482.1(b) (2016).

[3] "MLA means the Act of February 25, 1920, as amended, commonly referred to simply as the Mineral Leasing Act and codified at 30 U.S.C. [§] 181, *et seq.*, and the Mineral Leasing Act for Acquired Lands, as amended, 30 U.S.C. [§§] 351-359." 43 C.F.R. § 3480.0-5(25) (2016).

[4] 43 C.F.R. § 3480.0-5(34) (2016).

[5] 43 C.F.R. § 3480.0-5(19) (2016).

[6] *Id.*

4

operation, and be contiguous."[7] Any approved LMU must be mined pursuant to a BLM-approved R2P2.

On April 20, 1990, C.W. Mining filed an application with the BLM for approval of an LMU for the Bear Canyon Mine (Bear Canyon LMU).[8] The Bear Canyon LMU application was amended August 27, 1997, September 15, 1999, and April 27, 2001. The BLM approved the Bear Canyon LMU as amended on June 16, 2010. The approved Bear Canyon LMU includes federal coal leases and fee land owned by COP and ANR.

The Debtor and COP entered into a Coal Operating Agreement (COP Agreement) dated March 11, 1997, which was amended in June 2000 and June 2002. The Debtor and ANR entered into a Coal Operating Agreement (ANR Agreement) dated September 3, 1999, which was amended in June 2000 and April 2001. Pursuant to the terms of the Coal Operating Agreements, COP and ANR granted the Debtor the exclusive authority to operate and control certain real property, i.e., the Bear Canyon Mine. The tracts of land identified in the Coal Operating Agreements, including the federal coal leases and the fee land owned by COP and ANR, are the same tracts of land contained in the Bear Canyon LMU.[9]

---

[7] *Id.*; *see also* 30 U.S.C. § 202a(1).

[8] A more detailed discussion of the LMU's history is contained in this Court's Findings of Fact and Conclusions of Law on Trustee's Objection to ANR, Inc.'s Proof of Claim No. 27 and Trustee's Second Claim for Relief Against ANR, Inc. in Adversary Proceeding No. 09-2248. *See* Docket No. 929 in Case No. 08-20105 at 4-6. Unless otherwise specified, future references in this decision to "the LMU" mean the "Bear Canyon LMU."

[9] There were some minor discrepancies in the tracts of land described in the LMU and the tracts of land described in the Coal Operating Agreements, in that the LMU description included some tracts that were not included in the Coal Operating Agreements. This discrepancy existed at the time the LMU application was amended in 2001, and the Court has been advised that this discrepancy has now been resolved.

5

The Debtor became embroiled in litigation with one of its customers, Aquila, Inc., over an unfulfilled coal supply contract, and on October 30, 2007 Aquila obtained a large money judgment against the Debtor in the United States District Court for the District of Utah.[10] On January 8, 2008, Aquila and two other creditors filed an involuntary chapter 11 bankruptcy petition against the Debtor, which initiated this bankruptcy case (Bankruptcy Case). After the involuntary petition was filed and before the entry of the order for relief on September 26, 2009, the Bear Canyon Mine operations were transferred to Hiawatha Coal Company, Inc. The Bankruptcy Case was converted to a chapter 7 case on November 13, 2008, and on November 19, 2008, Kenneth A. Rushton was appointed as chapter 7 Trustee.

After the Trustee's appointment, litigation was initiated to recover possession of the Bear Canyon Mine from Hiawatha. The Trustee also initiated litigation to enable the sale of the Bear Canyon Mine and to assume and assign the Coal Operating Agreements. As part of his efforts, the Trustee asked the Court to interpret paragraph 5 of the Coal Operating Agreements (Continuous Operations Clause).[11] ANR and COP objected to the Trustee's assumption and assignment of the Coal Operating Agreements, arguing that the Trustee was incapable of curing defaults and would be incapable of mining in a manner consistent with the Coal Operating Agreements. Specifically, COP and ANR argued that the Trustee could not satisfy the

---

[10] *See Aquila, Inc. v. C. W. Mining*, No. 2:05–CV–00555 TC, 2007 WL 9643101 (D. Utah Oct. 30, 2007).

[11] A portion of paragraph 5 of the Coal Operating Agreements requires the operator of the mine to "diligently and continuously operate" the property in a "minerlike manner and in a manner which will result in the ultimate maximum economic recovery of coal." The Court has consistently referred to this portion of paragraph 5 as the "Continuous Operations Clause." Paragraph 5 is discussed in more detail in Section III.B, *infra*.

Continuous Operations Clause. On February 12, 2010, the Court entered its Order and Judgment

Arising From Trial on November 16, 17, 23, and 24, 2009 (Interpretation Order).[12] As part of the

Interpretation Order, the Court granted judgment to the Trustee on his Fifth Claim for Relief in

Adversary Proceeding No. 09-02248. The Court also determined that the Continuous Operations

Clause requires only that the operator of the Bear Canyon Mine "comply with applicable state

and federal regulations and, unless excused by the terms of the Coal Operating Agreements, mine

at least 1% of the estimated recoverable coal reserves (contained in both federal and fee lands

within [the LMU]) each year on a three-year rolling average."[13]

After the Trustee obtained the Interpretation Order, Rhino agreed to purchase the

Debtor's interest in the Bear Canyon Mine, including the Coal Operating Agreements, for $15

million. In connection with the sale, Rhino proposed to submit an amended R2P2 that would

change the method of mining from longwall to room-and-pillar. ANR and COP objected to the

Trustee's assumption and assignment of the Coal Operating Agreements, arguing that the Trustee

was incapable of curing existing defaults and that Rhino would be in breach of the Coal

Operating Agreements if it amended the R2P2 as contemplated. On August 4, 2010, this Court

entered the Final Sale and Assignment Order authorizing the sale of the Bear Canyon Mine and

the assignment of the Coal Operating Agreements to Rhino and, five days later, entered amended

findings and conclusions in connection with that sale and assignment (Final Sale and Assignment

---

[12] *See* Docket No. 1158 in Case No. 08-20105.

[13] *Id.* at 4-5.

Findings and Conclusions).[14] The Court declared that the Debtor, the Trustee, and the estate were

not in default under the Continuous Operations Clause.[15]

The approved sale of the Bear Canyon Mine to Rhino was closed on August 25, 2010. At

the closing, Castle Valley, as Rhino's designee,[16] purchased the Debtor's mining assets. On

December 14, 2010, Rhino submitted a request to the BLM to modify the R2P2 for the Bear

Canyon LMU. That modification sought to change the mining method from longwall mining to

room-and-pillar mining. On January 7, 2011, the BLM approved the modified R2P2, and Castle

Valley began producing coal from the Bear Canyon Mine three days later.

Almost immediately, COP and ANR declared defaults under the Coal Operating

Agreements. In the year and a half after Rhino purchased the Bear Canyon Mine, ANR and COP

each issued three notices of default, only the third of which is the subject of this action.[17] The

third set of default notices (Default Notices) were sent by COP on January 27, 2012, and by ANR

on January 28, 2012. Both Default Notices asserted that Rhino has committed defaults that are

"incapable of being cured" as a result of Rhino's submission of an amended R2P2, the BLM's

approval of the R2P2, and Rhino's commencement of mining in accordance with the R2P2.

---

[14] *See* Docket Nos. 1558 & 1574 in Case No. 08-20105. The Court will refer to the Final Sale and Assignment Order and the Final Sale and Assignment Findings and Conclusions collectively as the Sale Orders.

[15] *See* Docket No. 1574 in Case No. 08-20105, at 17 ("There is no current default under paragraph 5 of the [Coal] Operating Agreements.").

[16] Castle Valley LLC is a Delaware limited liability company and is Rhino's wholly-owned subsidiary.

[17] COP and ANR have abandoned or withdrawn the first and second notices of default.

These notices also assert that Rhino, by filing an amended R2P2, has unlawfully committed COP and ANR to mine in a manner that is inconsistent with the Coal Operating Agreements and results in "extraordinary and permanent damage" to COP and ANR and that the amendment of the R2P2 affects their rights after the expiration of the Coal Operating Agreements. COP also asserts that Rhino is in default based on conditions that were in existence prior to the closing of the sale to Rhino. These alleged defaults are directly contrary to the Final Sale and Assignment Order, which held that "[a]s of the Closing Date, all defaults under the COP [] Agreement have been cured (or shall be deemed to have been cured)."

Rhino brought this action seeking, under Count VI, enforcement of the Final Sale and Assignment Order through a declaratory judgment that COP and ANR are estopped from declaring default and asserting claims for (1) damages against Rhino based on present or future coal production under the Coal Operating Agreements so long as Rhino is in substantial compliance with a BLM-approved R2P2, or (2) damages against Rhino for lost or wasted coal so long as Rhino is in substantial compliance with a BLM-approved R2P2. In response to Rhino's Second Amended Complaint, COP and ANR asserted seven counterclaims for breach of contract, breach of the implied covenant of good faith and fair dealing, unjust enrichment, conversion, negligence, trespass, and intentional interference with economic relations.

COP and ANR appealed the Remand Order to the Tenth Circuit, which dismissed the appeal for lack of appellate jurisdiction since the Remand Order was not final, and the matter returned to this Court for adjudication. After conducting a hearing on December 14, 2016, the Court permitted COP and ANR to amend their counterclaims for purposes of clarification. The

twenty-two Amended Counterclaims were the result. The Court then conducted additional

hearings to further clarify and understand the parties' positions.

### III. DISCUSSION

Under Federal Rule of Civil Procedure 56(a), made applicable in adversary proceedings

by Federal Rule of Bankruptcy Procedure 7056, the Court is required to "grant summary

judgment if the movant shows that there is no genuine dispute as to any material fact and the

movant is entitled to judgment as a matter of law."[18] Substantive law determines which facts are

material and which are not. "Only disputes over facts that might affect the outcome of the suit

under the governing law will properly preclude the entry of summary judgment."[19] Whether a

dispute is "genuine" turns on whether "the evidence is such that a reasonable [fact finder] could

return a verdict for the nonmoving party."[20] In sum, the Court's function at the summary

judgment stage is to "determine whether there is a genuine issue for trial."[21]

The moving party bears the burden to show that it is entitled to summary judgment,[22]

including the burden to properly support its summary judgment motion as required by Rule

56(c).[23] If the moving party has failed to meet its burden, "summary judgment must be denied,"

---

[18] Fed. R. Civ. P. 56(a).

[19] *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

[20] *Id.*

[21] *Id.* at 249.

[22] *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

[23] *See Murray v. City of Tahlequah, Okla.*, 312 F.3d 1196, 1200 (10th Cir. 2002).

and the nonmoving party need not respond because "no defense to an insufficient showing is

required."[24] Once the moving party meets its initial burden, "the burden shifts to the nonmoving

party to demonstrate a genuine issue for trial on a material matter."[25] The nonmoving party may

not rely solely on allegations in the pleadings, but must instead designate "specific facts showing

that there is a genuine issue for trial."[26] The nonmoving party also "must do more than simply

show that there is some metaphysical doubt as to the material facts."[27]

When considering a motion for summary judgment, the Court views the record and draws

all reasonable inferences therefrom in the light most favorable to the nonmoving party,[28] but the

Court does not weigh the evidence or make credibility determinations.[29]

Rhino contends that it is entitled to summary judgment on Count VI and on Defendants'

Amended Counterclaims under the doctrine of collateral estoppel. Collateral estoppel applies to

legal as well as factual issues.[30] For collateral estoppel to apply, the party invoking the doctrine

must establish that: "(1) the issue previously decided is identical with the one presented in the

action in question, (2) the prior action has been finally adjudicated on the merits, (3) the party

---

[24] *Reed v. Bennett*, 312 F.3d 1190, 1194-95 (10th Cir. 2002).

[25] *Concrete Works of Colo., Inc. v. City & County of Denver*, 36 F.3d 1513, 1518 (10th Cir. 1994).

[26] *Celotex*, 477 U.S. at 324.

[27] *Matsushida Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).

[28] *E.g.*, *City of Herriman v. Bell*, 590 F.3d 1176, 1181 (10th Cir. 2010) (citation omitted).

[29] *Nat'l Am. Ins. Co. v. Am. Re-Insurance Co.*, 358 F.3d 736, 742-43 (10th Cir. 2004) (citing *Cone v. Longmont United Hosp. Ass'n*, 14 F.3d 526, 533 (10th Cir. 1994)).

[30] *United States v. Stauffer Chem. Co.*, 464 U.S. 165, 170-71 (1984).

against whom the doctrine is invoked was a party, or in privity with a party, to the prior

adjudication, and (4) the party against whom the doctrine is raised had a full and fair opportunity

to litigate the issue in the prior action."[31] In addition, the "issue decided must be essential to the

judgment," which "means that issue preclusion will not apply in the absence of a valid and final

judgment to which resolution of a particular issue was necessary."[32] COP and ANR do not

dispute that they were parties to the prior adjudications and concede that the third element of

collateral estoppel has been satisfied.

**A. The Issue Previously Decided Is Identical With the One Presented in This Action.**

    **1. The Issue Previously Decided.**

Rhino contends that the issues presented in Count VI and in the Defendants' Amended

Counterclaims have been previously adjudicated through the Sale Orders. In order to assign the

Coal Operating Agreements, the Trustee was required to (1) assume the Coal Operating

Agreements in accordance with the provisions of § 365 and (2) provide adequate assurance of

future performance by Rhino.[33] At the hearings on the sale of the Bear Canyon Mine, one of the

primary contested issues was the Trustee's proposed assumption of the Coal Operating

Agreements and their assignment to Rhino.

At the time of those hearings Rhino was identified as the proposed purchaser and

assignee. Rhino had determined that room-and-pillar mining would achieve MER and made clear

---

[31] *Dodge v. Cotter Corp.*, 203 F.3d 1190, 1198 (10th Cir. 2000) (citation omitted).

[32] *Stan Lee Media, Inc. v. Walt Disney Co.*, 774 F.3d 1292, 1297 (10th Cir. 2014).

[33] *See* § 365(f)(2).

12

that it would seek approval of an amended R2P2 that would change the method of mining from longwall to room-and-pillar. The Trustee urged the Court to make specific findings and exceptions to default under the Sale Orders.

In their objection to the assumption and assignment of the Coal Operating Agreements to Rhino, COP and ANR argued that the Trustee had failed to establish adequate assurance of Rhino's future performance under the Coal Operating Agreements. They maintained that Rhino's R2P2 would not be approved by the BLM because the 2006 R2P2 established the MER using the longwall method, and the room-and-pillar method proposed by Rhino could not satisfy the standard established by the 2006 R2P2. They also argued that the 2006 R2P2 amounted in substance to an amendment of the Coal Operating Agreements. As a consequence, the Debtor, the Trustee, or his designees could not alter the 2006 R2P2, and Rhino would be in default under the Coal Operating Agreements if it amended the R2P2 as proposed. COP and ANR further argued that Rhino's decision not to use the longwall method would render it impossible for Rhino to mine out the entire reserves within the LMU during the remaining term of the Coal Operating Agreements. Therefore, Rhino would be in default under those agreements.

Accordingly, while the issue previously decided in the Court's Interpretation Order and Sale Orders has many facets, at its core it amounts to whether Rhino would be in default under the Coal Operating Agreements if it obtained approval of—and mined pursuant to—an amended R2P2. The Court decided that Rhino would not be in default in that instance and also determined what would constitute default under the Coal Operating Agreements. Specifically, the Court held that so long as Rhino "mines in substantial compliance with an R2P2 as approved by the BLM and substantially complies with applicable Federal, State and local laws[,] [Rhino] is not in

13

default under paragraph 5 of the [Coal] Operating Agreements." That ruling set the standard for when Rhino could be considered in default.

That ruling was also essential to the Sale Orders. In order to assume the Coal Operating Agreements and assign them to Rhino, the Trustee had to show adequate assurance of Rhino's future performance under the Coal Operating Agreements. Resolution of what would constitute default under the Coal Operating Agreements was necessary to provide adequate assurance of Rhino's future performance.

### 2. The Issues in This Action.

The Defendants argue that the issues in this action are not identical with those presented in the prior adjudications because the factual allegations that form the basis of their counterclaims arose after Rhino purchased the mine. This argument has brief appeal at first glance—how could the Court have decided the issues raised by Rhino's post-sale conduct before it occurred? But the argument does not withstand a closer examination. Put succinctly, the conduct the Defendants complain of rehashes the prior disputes regarding Rhino's choice to mine under an amended R2P2, which were squarely addressed and decided in the Sale Orders.

In the Default Notices, COP and ANR stated their intentions to terminate the Coal Operating Agreements based on alleged defaults resulting from Rhino's amendment of the 2006 R2P2 and the "modifications to the methods, timing and sequence of mining" of COP's and ANR's property. Although there are numerous defaults alleged in the Default Notices, the primary defaults COP and ANR assert are that the amendment to the R2P2 (1) "does not result in the 'maximum economic recovery of coal'" from their property, and (2) impermissibly extends mining operations and reclamation beyond the term of the Coal Operating Agreements. The

14

Default Notices further assert that as a result of the BLM's approval of Rhino's amended R2P2 and Rhino's commencement of mining thereunder, Rhino has "already caused permanent injury to ANR [and COP]," COP and ANR have suffered "extraordinary and permanent damage," and that "by preparing, submitting and obtaining approval of its modified R2P2, [Rhino] has abandoned these valuable, recoverable coal reserves."

COP and ANR argue that the issue in this case is different from the issue previously decided because this Court did not decide whether Rhino's mining method would achieve MER with respect to *fee* coal, i.e., COP's and ANR's coal reserves. The parties have engaged in extensive litigation before the BLM and the Interior Board of Land Appeals (IBLA) regarding whether Rhino's amendments to the R2P2 result in MER for the Bear Canyon Mine. The upshot of that litigation was that Rhino was achieving MER for federal coal, but the BLM and IBLA declined to address whether it was doing the same for fee coal.[34] From the Defendants' perspective, if the BLM and IBLA have not decided and cannot decide whether Rhino's R2P2 achieves MER for fee coal, that opens the door to allege—in the proper forum—that Rhino is in default of the Coal Operating Agreements for failing to achieve MER with respect to fee coal.

---

[34] *See* Docket No. 184, Ex. 2, IBLA Order Dated Dec. 15, 2014 Denying Petition for Stay, at 4 n.10 ("Since BLM is only obligated to ensure that [Castle Valley Mining] achieves the MER of Federal coal, we do not address whether BLM violated any private agreement by failing to ensure that [Castle Valley Mining] achieved the MER of *non-Federal coal*.").

The Court agrees that, under the applicable federal regulations,[35] the BLM is primarily

concerned with the mining of federal coal.[36] It is true, as the Plaintiff points out, that the

regulations occasionally consider fee coal either expressly or by implication.[37] But that does not

mean that the BLM considers fee coal when it determines MER, the relevant question to this

decision. In fact, the regulations point to the contrary conclusion. The rules seek to "ensure MER

of Federal coal,"[38] the operator/lessee is required to "conduct operations to achieve MER of the

Federal coal,"[39] and MER itself is defined in such a way to refer only to federal coal: MER

---

[35] Broadly speaking, 43 C.F.R. § 3400, *et seq.* deal with coal management, and the regulations thereunder "are issued under the authority of and to implement provisions of," among other statutes, "The Mineral Leasing Act of February 25, 1920, as amended (30 U.S.C. [§] 181, *et seq.*)." 43 C.F.R. § 3400.0-3(a). More specifically, 43 C.F.R. §§ 3480.0-1 to 3487.1 deal with the discrete rules applicable to coal exploration and mining operations.

[36] *See* 43 C.F.R. § 3480.0-1 (2016) ("The purposes of the rules of this part are to ensure orderly and efficient development, mining, preparation, and handling operations for Federal coal . . . ."); 43 C.F.R. § 3480.0-4 (2016) ("The rules of this part shall govern operations for the exploration, development, and production of Federal coal under Federal coal leases, licenses, and permits, regardless of surface ownership, pursuant to the Mineral Leasing Act of February 25, 1920, as amended (MLA), and in conjunction with the rules at 43 CFR Group 3400 and 30 CFR Chapter VII.").

[37] This is particularly apparent in the regulations concerning the formation of an LMU. An LMU application must demonstrate, for instance, that mining operations will "[f]acilitate development of the coal reserves in an efficient, economical, and orderly manner." 43 C.F.R. § 3487.1(f)(2)(ii) (2016). The BLM evaluates this criterion by considering, among other things, the "potential for independent development of each lease proposed to be included in the LMU," and the "potential for inclusion of the leases in question in another LMU." *Id.* In other words, the BLM must determine whether all coal reserves in a proposed LMU—federal or not—will be developed appropriately and also must assess whether each lease in that LMU—federal or not—makes sense in the context of that LMU.

[38] 43 C.F.R. § 3480.0-1 (2016); *see also* 43 C.F.R. § 3480.0-5(33) (2016) ("Resource recovery and protection includes practices to: . . . ensure MER of the Federal coal.").

[39] 43 C.F.R. § 3484.1(b)(1) (2016).

"means that, based on standard industry operating practices, all profitable portions of a leased

Federal coal deposit must be mined."[40] Moreover, even though an LMU may contain federal and

fee coal,[41] the BLM will only approve an LMU if the LMU application "demonstrates that mining

operations on the LMU" will, among other things, "[a]chieve maximum economic recovery of

Federal recoverable coal reserves within the LMU."[42]

Nevertheless, even though the BLM and IBLA did not decide the issue of whether Rhino

is achieving MER on fee coal, the Court concludes that this is not a new issue, but rather a

previously decided one simply cloaked in different garb. At oral argument on May 25, 2017, the

Court questioned counsel for COP and ANR whether the MER for federal coal differs from that

for fee coal. He responded that he was not asserting that the standards are different, merely that

there is no body to adjudicate whether it is being met for fee coal. Accordingly, the issue is not

whether a separate standard applies to fee coal, but instead whether Rhino has met that standard.

Or to put it concisely, whether Rhino is in default.

This issue has been litigated and decided. As stated previously, the Court found that

Rhino would not be in default under paragraph 5 of the Coal Operating Agreements as long as it

mined in substantial compliance with a BLM-approved R2P2 and substantially complied with

---

[40] 43 C.F.R. § 3480.0-5(21) (2016); *see also ANR Co.*, 182 Interior Dec. 248, 259 (IBLA 2012) ("The operator must . . . mine the leased Federal coal in accordance with the approved mine plan, and, by doing so, the operator will, by definition, achieve maximum economic recovery.").

[41] *See* 43 C.F.R. § 3480.0-5(19) (2016) ("An LMU may consist of one or more Federal leases and may include intervening or adjacent lands in which the United States does not own the coal.").

[42] 43 C.F.R. § 3487.1(f)(2)(i) (2016).

17

applicable Federal, State, and local laws. The Court made clear what would constitute an event of default under paragraph 5, and failing to achieve MER with respect to fee coal is not one of those events. The issue of what constitutes default has been litigated, and COP and ANR may not relitigate it by, in effect, seeking to amend the Sale Orders by adding "failing to achieve MER of fee coal" to the enumerated grounds constituting default.

Of course, failing to achieve production goals with respect to fee coal within a given LMU could constitute default under the applicable lease if it were specific enough. For example, a lease of fee coal reserves could provide that the operator would have to mine a certain tonnage of coal according to a set schedule. And in so doing, the owners of the fee lands would be protected in the event that those lands were put into an LMU, where the operator or lessee—not the owner or lessor—submits an R2P2,[43] and the BLM determines whether the operator is mining federal coal in a way that achieves MER.

But those are not the facts of this case. Here, the relevant portions of the Coal Operating Agreements only require that the operator "conduct all operations . . . in a manner which will result in the ultimate maximum economic recovery of coal from the property . . . ." MER is a term of art within the mining industry and, as discussed above, is defined by reference to federal coal alone. As MER is used in the Coal Operating Agreements, however, it is ambiguous: It is unclear whether it applies to fee coal.[44] But even if that were clear, it still would have provided no sure guidance to an operator. This Court has previously found that, from Joseph Kingston's

---

[43] 43 C.F.R. § 3482.1(b) (2016).

[44] Since MER is defined by reference to federal coal alone, requiring MER of fee coal is an oxymoron unless MER is expressly defined in a lease to include fee coal.

perspective, "'ultimate maximum economic recovery' could require an operator to mine even if such operations were physically possible but economically unprofitable."[45] Of course, that description is the exact opposite of MER, which requires mining all *profitable* portions of a coal deposit. In short, the drafters of the Coal Operating Agreements could have provided a discrete and clear standard of recovery that applied specifically to fee coal, but they did not do so.

Owners of fee land should know that when they include that land in an LMU, they cede some control over how the coal will be mined to the operator and the BLM. COP and ANR allowed certain of their fee land to be included in an LMU, apparently to preserve some federal coal leases. The Coal Operating Agreements with C.W. Mining, the operator of the Bear Canyon Mine, could have clearly and expressly described the operator's responsibilities with respect to fee coal. But they did not, and this Court's prior rulings on the interpretation of the Continuous Operations Clause and what constitutes default under the Coal Operating Agreements filled in that missing detail and are now the law of the case.

While COP and ANR are correct that the Court could not have prospectively deemed Rhino to be in substantial compliance when it issued the Sale Orders, COP and ANR have not raised a genuine dispute as to Rhino's substantial compliance in their briefing or their Amended Counterclaims. Absent such a dispute, the issue of whether Rhino is in default under paragraph 5 of the Coal Operating Agreements for allegedly failing to achieve MER of fee coal has been decided by this Court. Candidly, the Court does not see how the alleged lack of a forum to argue MER with respect to fee coal precludes summary judgment. Again, the Court's prior orders gave

---

[45] Docket No. 1053 in Case No. 08-20105, Findings of Fact and Conclusions of Law Arising from Trial on November 16, 17, 23, and 24, 2009, at 6.

the Defendants two avenues to assert defaults under the Coal Operating Agreements: They could allege that Rhino was not substantially complying with (1) a BLM-approved R2P2, or (2) applicable Federal, State, and local laws. They have not alleged facts supporting default under either option.

As a whole, the Amended Counterclaims rehash issues that this Court has already decided. The first Amended Counterclaim seeks a declaratory judgment that the BLM cannot make decisions regarding the R2P2 that covers fee land without COP's and ANR's approval, and that any such decisions that have been made should be declared void. The Final Sale and Assignment Findings and Conclusions forecloses this relief, since the Court found that "[n]either COP nor ANR has any veto power or other rights of control as to the content or approval of [R2P2] plans."[46]

The second Amended Counterclaim seeks a declaratory judgment that COP and ANR have the rights and duties of a lessee under 43 C.F.R. part 3400. Such relief is precluded by the Court's prior finding that it is inappropriate for the Court to infringe on the BLM's jurisdiction to determine such matters. [47] Amended Counterclaims 3 and 22 allege that Rhino is committing waste of coal reserves at the Bear Canyon Mine and request damages for that waste and the ability to participate in all dealings between the BLM and Rhino. Again, the Court previously ruled that so long as Rhino mines in substantial compliance with a BLM-approved R2P2, it

---

[46] Docket No. 1574 in Case No. 08-20105, at 19.

[47] *Id.* at 20.

would be in compliance with paragraph 5 of the Coal Operating Agreements. Alleging waste does not raise a genuine dispute on the issue of substantial compliance.

The fourth Amended Counterclaim takes issue with Rhino's R2P2, which COP and ANR allege extends the life of the mine beyond the Coal Operating Agreements while committing waste and not achieving MER. The fifth Amended Counterclaim alleges breaches of the Coal Operating Agreements, including Rhino's obtaining a new R2P2. The sixth Amended Counterclaim alleges that Rhino breached the implied covenant of good faith and fair dealing inherent in the Coal Operating Agreements by, among other things, obtaining a new R2P2. The Court has squarely addressed these issues in its prior rulings.

Amended Counterclaims 7-14 allege default and breach of the Coal Operating Agreements for one reason or another: failure to pay property taxes,[48] failure to pay royalties, failure to file a complete permit application with the Utah Division of Oil, Gas and Mining (DOGM), and failure to adequately address asserted environmental conditions at the Bear Canyon Mine. Some of these claims encompass post-sale acts, but they do not raise an issue different from the one the Court decided in the Sale Orders unless COP and ANR can show that Rhino is not substantially complying with its R2P2 or applicable law. COP and ANR have failed to raise a genuine dispute regarding substantial compliance in these counterclaims. As such, these counterclaims fail to raise an issue different from that previously decided in the Sale Orders.[49]

---

[48] There were taxes owing at one time, but the parties do not dispute that those have since been paid.

[49] The fourteenth Amended Counterclaim aggregates all breach of contract claims and asserts that if each alleged breach is not enough by itself to cause default, taken together they are sufficient. Since this claim comprises all breach of contract claims, which raise no different

Amended Counterclaims 15-17 are tort claims for conversion and intentional interference with economic relations. The conversion claim alleges that Rhino has converted royalty payments owing to COP and ANR by failing to mine all of the coal COP and ANR believes it should be mining. The intentional interference claims complain of Rhino's mining methods under its R2P2, essentially arguing that Rhino is taking the easily-accessible coal and leaving the less-profitable coal for a successor operator while obligating COP and ANR to pay for the costs of reclamation. These are repackaged breach of contract claims, and Rhino's ability to mine under its R2P2 is an issue that has already been litigated and decided. Absent a showing that Rhino is not mining in substantial compliance with that R2P2, these claims are barred by collateral estoppel.

In the alternative, these tort claims are also barred by the economic loss rule. Stated plainly, the "economic loss rule prevents recovery of economic damages under a theory of tort liability when a contract covers the subject matter of the dispute."[50] The rule "serves two purposes. First, it bars recovery of economic losses in negligence actions unless the plaintiff can show physical damage to other property or bodily injury. Second, [it] prevents parties who have contracted with each other from recovering beyond the bargained-for risks."[51] Accordingly, the rule "marks the fundamental boundary between contract law, which protects expectancy interests

_____

issues, this claim does not either.

[50] *Reighard v. Yates*, 285 P.3d 1168, 1176 (Utah 2012).

[51] *Sunridge Dev. Corp. v. RB & G Eng'g, Inc.*, 230 P.3d 1000, 1006 (Utah 2010) (internal citations omitted).

created through agreement between the parties, and tort law, which protects individuals and their property from physical harm by imposing a duty of reasonable care."[52]

Here, the Coal Operating Agreements cover the subject matter of COP's and ANR's claims. Those agreements specify what responsibilities and requirements an operator of the Bear Canyon Mine has, and the Court has interpreted the provisions of those agreements to determine precisely what those responsibilities and requirements are. COP and ANR have not alleged physical damage to their property or anything beyond the bargained-for risks contemplated by the Coal Operating Agreements. At bottom, COP's and ANR's claims take issue with how Rhino has chosen to mine. Because the Coal Operating Agreements address an operator's standard of mining performance, COP and ANR may not assert tort claims for Rhino's mining methods.

Amended Counterclaim 18 seeks to void the LMU Agreement that COP and ANR submitted to the BLM. The heart of this claim is that COP and ANR want to participate in decisions regarding modifications to the R2P2. They assert that their prior course of dealing with the Debtor provided for such participation, but because the LMU Agreement does not expressly do so, the LMU Agreement should be voided. Amended Counterclaim 18 resembles Amended Counterclaim 1 in its attempt to insert COP and ANR into the R2P2 decision-making process.

---

[52] *Davencourt at Pilgrims Landing Homeowners Ass'n v. Davencourt at Pilgrims Landing, LC*, 221 P.3d 234, 242 (Utah 2009) (citation and internal quotation marks omitted). Although the economic loss rule originated in products liability law, Utah courts have applied it in other contexts, including the construction setting, which is "characterized by detailed and comprehensive contracts" and where the "[c]ontracting parties are free to adjust their respective obligations to satisfy their mutual expectations." *SME Indus., Inc. v. Thompson, Ventulett, Stainback & Assocs., Inc.*, 28 P.3d 669, 680-81 (Utah 2001). This Court believes that the Utah Supreme Court would extend the economic loss doctrine to the context of mining disputes since the parties involved in such disputes, like those in the construction industry, "resort to contracts and contract law to protect their economic expectations." *Id.* at 681.

For the same reason that Amended Counterclaim 1 is precluded—i.e., COP and ANR lack veto power and control over the content and approval of R2P2 plans—this Amended Counterclaim is precluded as well.

Amended Counterclaims 19-21 allege claims for negligence, trespass, and quiet title. The negligence claim, like many of the other claims, takes issue with Rhino's mining methods under the R2P2. The trespass claim alleges that Rhino has no enforceable contract allowing it to enter the Bear Canyon Mine, while the quiet title claim seeks to declare that certain mining-related equipment is the property of COP and ANR. These claims are precluded by the Court's prior rulings. Rhino's mining method is a matter for the BLM, and as long as Rhino mines in substantial compliance with its BLM-approved R2P2, it has not defaulted under the Coal Operating Agreements. The trespass and quiet title claims seek to undo the Court's prior orders that authorized the sale of the Bear Canyon Mine to Rhino.

The issues presented under Count VI and the Amended Counterclaims boil down to the singular fact that COP and ANR do not like how Rhino has chosen to operate the Bear Canyon Mine since purchasing it. This dislike has taken the form of several complaints, which assert that Rhino has run afoul of the Continuous Operations Clause. For example, COP and ANR have taken issue with Rhino's choice to change the method of mining from longwall to room-and-pillar. They have objected to Rhino's decision—at least at the present time—to mine COP's coal, but not ANR's. And they have protested Rhino's new mining schedule, which does not propose to mine all of the coal and reclaim the land before the Coal Operating Agreements terminate. The common denominator among these complaints is that Rhino is not mining in the way COP and ANR would like it to, and as a consequence COP and ANR believe Rhino is in default. But

24

whether Rhino's mining choices trigger default under the Continuous Operations Clause is an

issue this Court has previously decided. However COP and ANR characterize their complaints

about Rhino's mining, they present the same issue decided when the Court authorized the sale of

the mine—under what conditions Rhino would or would not be in default of the Continuous

Operations Clause. Accordingly, the Court concludes that the issue here is identical to that

presented in the prior adjudications, and the first element of collateral estoppel is satisfied.

**B. The Prior Action Has Been Finally Adjudicated on the Merits.**

On June 9, 2009, the Trustee filed a Motion to Assume Coal Operating Agreements and

Certain Related Contracts (Assumption Motion).[53] Paragraph 5 of both the COP Agreement and

the ANR Agreement state the following:

> **Operator shall diligently and continuously operate the subject
> property** for the term hereof unless the operation thereof is
> prevented by strike, car shortages, government regulation, any act
> of God, or similar cause beyond the control of Operator, or unless
> all of the merchantable coal in said premises is sooner extracted,
> mined and removed. **Operator shall conduct all operations
> hereunder in a good and minerlike manner and in a manner
> which will result in the ultimate maximum economic recovery
> of coal from the property** . . . .
>
> Operator shall, in the operation and development of the premises,
> comply with all applicable Federal, State, and local laws that apply
> to Operator's mining operation and shall conduct its mining
> operations and take all actions and perform all duties required to
> maintain the Federal and State mining permits and approvals
> relating to the Premises. (Emphasis added.)

On June 22, 2009, the Trustee filed Adversary Proceeding No. 09-2248 against COP,

ANR, and others. The Trustee's Fifth Claim for Relief sought a declaratory judgment against

---

[53] Docket No. 671 in Case No. 08-20105.

COP and ANR interpreting the meaning of the term "diligently and continuously operate"as used in the Continuous Operations Clause. Specifically, the Trustee sought a judicial declaration that the terms in paragraph 5 of the Coal Operating Agreements are synonymous with the definitions of "diligence" and "continuous" provided in 43 C.F.R. §§ 3480-3483.[54]  In response to the Trustee's complaint, COP filed a counterclaim asserting that the Trustee had failed to perform numerous affirmative obligations imposed by the COP Agreement, including the duty to "diligently and continuously operate the subject property" and "conduct all operations in a manner which will result in the ultimate maximum economic recovery of coal from the property."[55]

On September 30, 2009, the Court entered an order consolidating for trial the Trustee's claims for relief 5, 6, 7, and 9 with the Assumption Motion.[56] Squarely at issue in this trial was the interpretation of paragraph 5 and specifically the Continuous Operations Clause. In his trial brief, the Trustee argued that under Utah law paragraph 5 was ambiguous and the Court should receive parol evidence regarding the parties' intent.[57] The Trustee further argued that paragraph 5 only required the Debtor to actively operate the LMU in compliance with BLM requirements and that the parties' intent was that ANR's property would be mined at a later date. ANR's trial brief argued that the parties did not intend the ANR Agreement's production requirements to be

---

[54] Docket No. 1 in Adv. No. 09-2248, at 47-48.

[55] Docket No. 26 in Adv. No. 09-2248, at 35.

[56] Docket No. 934 in Case No. 08-20105.

[57] Docket No. 91 in Adv. No. 09-2248 and Docket No. 1018 in Case No. 08-20105, at 11-13.

synonymous with the federal lease requirements.[58] In COP's trial brief, it contended that the

Trustee's "requested interpretation of Paragraph 5 of the [COP] Agreement [was] contradictory

to its plain meaning"and the "operator is required to mine in a way that produces the most

economic value to COP."[59]

The Court conducted a trial over four days and on December 9, 2009, the Court entered

its Findings of Fact and Conclusions of Law Arising From Trial on November 16, 17, 23, and 24,

2009 (2009 Findings and Conclusions). In paragraph 7 of its 2009 Findings and Conclusions the

Court noted:

> 7.   At the heart of the dispute between the parties is the
> amount of discretion granted to the landlords, COP, and ANR, to
> determine how and when the operator must operate in order to
> fulfill its requirements under the operating agreements to
> "diligently and continuously operate" in a fashion that will realize
> the "ultimate maximum economic recovery" or, in other words,
> whether the landlords have discretion to impose their own
> standards for the safe, efficient, and non-wasteful operation of the
> mine.[60]

After reviewing the definitions of "continued operation" and "maximum economic recovery" in

the Code of Federal Regulations, and noting that the Continuous Operations Clause is not exactly

parallel with the similar phrases in the Code of Federal Regulations, the Court concluded that it

had no choice but to interpret the Continuous Operations Clause in the manner suggested by the

Trustee because of the phrases' similarity. The Court then stated:

---

[58] Docket No. 94 in Adv. No. 09-2248 and Docket No. 1021 in Case No. 08-20105, at 5-
7.

[59] Docket No. 1017 in Case. No. 08-20105, at 4, 6.

[60] Docket No. 107 in Adv. No. 09-2248 and Docket No. 1053 in Case No. 08-20105, ¶ 7.

16.   Most importantly, however, no coherent alternative standard for the Continuous Operations Clause was presented to the Court. Essentially, COP and ANR argue that the Continuous Operations Clause is subject to the whim and caprice of those entities.

17.   Joseph Kingston even testified that "ultimate maximum economic recovery" could require an operator to mine even if such operations were physically possible but economically unprofitable and that he would interpret the phrase "diligently and continuously operate" differently if a new entity were to take over the Bear Canyon Mine.

. . . .

19.   Thus, the standard argued by COP and ANR apparently depends on whatever may be in Joseph Kingston's head at any particular point in time, which of course in no standard at all. There is simply no way for an independent operator—or any operator, including Hiawatha or the Debtor—to be able to know whether or not it is complying with the Continuous Operations Clause under such a "standard," and neither COP nor ANR has pointed the Court to any other basis such as case law or industry practice for interpreting the Continuous Operations Clause in a manner different than the one suggested by the Trustee.

20.   Accordingly, the Court must adopt the Trustee's interpretation of the Continuous Operations Clause and the relief requested in the Fifth Claim for Relief is GRANTED, i.e., the Continuous Operations Clause only requires the operator to mine 1% of the estimated recoverable coal reserves (**contained in both federal and fee lands within the LMU**) each year on a three-year rolling average, and the Debtor is not in default under the Continuous Operations Clause. (Emphasis added.)[61]

Pursuant to its 2009 Findings and Conclusions, the Court entered a final order and judgment on the Trustee's Fifth Claim for Relief on February 12, 2010. COP and ANR appealed that order and judgment.

---

[61] *Id.* at 6-7.

On March 2, 2010, the Court entered its Order Authorizing Sale of Assets Free and Clear of Liens and Interests Pursuant to 11 U.S.C. § 363 and Authorizing Assumption and Assignment of Unexpired Leases Pursuant 11 U.S.C. § 365 (First Sale Order).[62] Although the First Sale Order granted much of the relief requested in the Assumption Motion, the assumption and assignment were subject to further order of the Court. On May 3, 2010, the Trustee filed a Motion for Additional Findings on Trustee's Motion Requesting Authority to Assume Executory Contracts and Motion for Order Authorizing Assignment of Executory Contracts and Sale of Mine Assets Free and Clear of All Liens, Claims, Interests, and Encumbrances Pursuant to 11 U.S.C. §§ 105, 363 and 365 (Assignment and Sale Motion).[63] The Assignment and Sale Motion sought a further order of the Court as contemplated by the First Sale Order.

Although the Court had already determined that the Debtor was not in default under the Coal Operating Agreements in the First Sale Order, the Court still had to address the issue of whether the Trustee could provide adequate assurance of Rhino's future performance under the Coal Operating Agreements. In particular, the Court considered whether Rhino would be able to "diligently and continuously operate" under the Coal Operating Agreements.

The Court conducted trial on the Assignment and Sale Motion over seven days. During the hearings on the sale, representatives of Rhino testified that if Rhino bought the Bear Canyon Mine it intended to change the method of mining from the longwall method employed by the Debtor to the room-and-pillar method and to seek permission for that change from the BLM by

---

[62] Docket No. 1189 in Case No. 08-20105.

[63] Docket No. 1299 in Case No. 08-20105.

29

filing an amended R2P2. COP and ANR both strenuously objected to assumption and assignment

of the Coal Operating Agreements, arguing that the proposed change in the mining method made

it impossible for the Trustee to establish adequate assurance of Rhino's future performance under

the Coal Operating Agreements. COP and ANR argued that Rhino would be in default under the

Coal Operating Agreements if it amended the R2P2 as it proposed, and the BLM would not

approve Rhino's R2P2 because the room-and-pillar method proposed by Rhino could not satisfy

the MER standard established by the 2006 R2P2. They further argued that Rhino's decision not

to use the longwall method would render it impossible for Rhino to mine out the entire reserves

within the LMU during the remaining term of the Coal Operating Agreements. COP's and

ANR's objections were summarized in the Court's Final Sale and Assignment Findings and

Conclusions:

> 39.  COP argues that the contents of [an R2P2] submitted
> by the Debtor to the BLM in 2006 (the "2006 R2P2") and
> subsequently approved by the BLM amount in substance to an
> amendment of the COP [] Agreement or otherwise somehow have
> become unalterable obligations of the Operator under that
> agreement. In particular, COP contends that the 2006 R2P2
> requires the [MER] from the entire LMU to be realized within a
> time limit of 40 years from April 1990, when the original version
> of the LMU Application was filed. COP further contends that
> [Rhino]'s decision not to use longwall mining equipment to extract
> coal from the Tank Seam renders it impossible for [Rhino] to mine
> out the entire reserves within the LMU within the remaining part of
> the 40-year mine-out period.
>
> 40.  Charles Reynolds testified that Rhino's production
> schedule does not comply with the approved R2P2 or the approved
> [LMU] and Rhino's coal production will not meet the continued

operation requirement of the BLM and Rhino therefore can not perform under the [Coal] Operating Agreements.[64]

The Court overruled COP's and ANR's objections and made specific findings and conclusions on their objections in paragraphs 41 through 45 of the Final Sale and Assignment Findings and Conclusions:

41.   The stipulations imposed by the BLM and accepted by the Trustee in connection with the LMU Decision (Exh. TR 607 and 610) require in part that "Prior to commencement of mining on the Bear Canyon LMU, an update to the 2006 R2P2 shall be required" . . . . Such R2P2 plans are routinely amended to adapt to changing conditions encountered during mining, and such amendments are routinely approved by the BLM. Neither COP nor ANR has any veto power or other right of control as to the contents or approval of such plans.

42.   The BLM can grant extensions to the 40[-]year life-of-mine mine-out requirements. Charles Reynolds testified that it is common for amendments to an R2P2 or an LMU to be approved by the BLM. He also testified that compliance with the BLM continued operation clauses can be accomplished in a number of ways including meeting the 1% of recoverable reserves test, applying for, and obtaining a waiver from the BLM and through payment of advance royalty payments in lieu of production.

43.   The uncontested evidence is that the BLM determines whether an operator is in compliance with the "continued operation" and "maximum economic recovery" requirements contained in the Code of Federal Regulations and that this Court has no jurisdiction over the BLM's decisions on that matter.

44.   The BLM and other Federal, State and local agenc[ies] responsible for enforcing mining regulations have the jurisdiction to interpret their regulations and requirements and compliance with the same. It is inappropriate for this Court to speculate with respect to future actions of these agencies or to enter an order that may be inconsistent with or infringe on the jurisdiction of these agencies.

---

[64] Docket No. 1574 in Case No. 08-20105, at 18-19.

>45.  So long as [Rhino] mines in substantial compliance
>with an R2P2 as approved by the BLM and substantially complies
>with applicable Federal, State and local laws [Rhino] is not in
>default under paragraph 5 of the [Coal] Operating Agreements.[65]

The Court granted the Trustee's Assignment and Sale Motion, subject to certain

conditions, in the Final Sale and Assignment Order. In that order, the Court held that:

>10.  As of the Closing Date, all defaults under the COP []
>Agreement have been cured (or shall be deemed to have been
>cured). **The COP [] Agreement is in full force and effect and
>shall be enforceable in accordance with its terms, as construed
>by the Court's prior orders and this Order**. . . .

>11.  No monetary or other default exists under the ANR []
>Agreement. Alternatively, as of the Closing Date, all defaults, if
>any, under the ANR [] Agreement have been cured (or shall be
>deemed to have been cured. . . . (Emphasis added.)[66]

By its orders of December 9, 2009 and August 4, 2010, and the Final Sale and

Assignment Findings and Conclusions of August 9, 2010, this Court finally adjudicated the issue

of what conditions would cause Rhino to be in default under the Coal Operating Agreements.

The Court finally adjudicated that Rhino would not be in default under paragraph 5 of the Coal

Operating Agreements so long as it mined in substantial compliance with an R2P2 as approved

by the BLM and substantially complied with applicable Federal, State and local laws. On August

18, 2010, COP and ANR appealed the Final Sale and Assignment Order.

COP and ANR argue that the Court did not finally adjudicate the prior actions relevant to

this case on the merits because § 363(m) mooted their appeals on those actions. The Court will

---

[65] *Id.* at 19-20.

[66] Docket No. 1558 in Case No. 08-20105, at 4.

deal with the issue of § 363(m) mootness more fully in Section III.C, *infra*, since it relates more closely to the final element of collateral estoppel. For the purposes of this section, however, it suffices to note the untenable conclusion that Defendants' argument would lead to if it were followed. COP and ANR would treat all orders mooted by § 363(m) as non-final for purposes of collateral estoppel. In short, issue preclusion would be categorically inapplicable to § 363(m) sale orders. The practical effect of such a rule would be to open an avenue to attack § 363(m) sale orders and the validity of the sales themselves. Deprived of the ability to contest the validity of the sale order through appeal, a party that was unsatisfied with a § 363(m) order might nonetheless be able to challenge it through a subsequent lawsuit and obtain relief inconsistent with the sale order. Such an outcome would allow an end-around § 363(m) and eviscerate the statute's purpose, which is to ensure the finality of bankruptcy sales. Accordingly, the Court declines to adopt the Defendant's interpretation of collateral estoppel's applicability to § 363(m).

## C. COP and ANR Had a Full and Fair Opportunity to Litigate the Issue in the Prior Action.

Whether a party had a "full and fair opportunity to litigate an issue often will focus on whether there were significant procedural limitations in the prior proceeding, whether the party had the incentive to litigate fully the issue, or whether effective litigation was limited by the nature or relationship of the parties."[67]

COP and ANR argue that they have not had a full and fair opportunity to litigate because they assert that the issue they want to litigate—whether Rhino's post-sale conduct constitutes a

---

[67] *Stan Lee Media, Inc.*, 774 F.3d at 1297.

breach of the Coal Operating Agreements or the implied covenant of good faith and fair

dealing—has never in fact been litigated. At its core, this argument goes more to what the issues

are and whether they are identical rather than whether there were significant procedural

limitations in the prior proceedings. Because the Court has already addressed the argument

regarding the identity of issues in Section III.A, *supra*, the Court will not revisit it here.

COP and ANR also contend that they have not had a full and fair opportunity to litigate

the issue in question because they have lacked a full and fair opportunity for appellate review of

this Court's prior orders. Their argument focuses on the effect of § 363(m), which provides:

> The reversal or modification on appeal of an authorization under
> subsection (b) or (c) of this section of a sale or lease of property
> does not affect the validity of a sale or lease under such
> authorization to an entity that purchased or leased such property in
> good faith, whether or not such entity knew of the pendency of the
> appeal, unless such authorization and such sale or lease were
> stayed pending appeal.[68]

The purpose of § 363(m) is to "protect[] the public's interest in finalizing bankruptcy sales."[69]

"Finality is important because it minimizes the chance that purchasers will be dragged into

endless rounds of litigation to determine who has what rights in the property."[70] "An asset that

provides a near-certain guarantee of litigation and no guarantee of ownership is likely to have a

low sale price; by removing these risks, § 363(m) allows bidders to offer fair value for estate

---

[68] § 363(m).

[69] *In re C.W. Mining Co.*, 740 F.3d 548, 555 (10th Cir. 2014) (citation and internal
quotation marks omitted).

[70] *Raskin v. Malloy*, 231 B.R. 809, 813 (N.D. Okla. 1997) (quoting *In re Sax*, 796 F.2d
994, 998 (7th Cir. 1986)).

property."[71] But because § 363(m) maintains the validity of sales to good faith purchasers, it "will moot some appeals, namely, those in cases where the only remedies available are those that affect the validity of the sale."[72]

When the Court entered the Sale Orders approving the sale of the Bear Canyon Mine to Rhino, it found that Rhino was a purchaser in good faith and therefore entitled to the protections of § 363(m).[73] "After the sale closed, [the Trustee] and Rhino moved to dismiss as moot the various appeals still pending in district court, citing § 363(m) mootness and, in the alternative, equitable mootness. The district court agreed with both mootness rationales and dismissed the underlying appeals."[74] The Tenth Circuit affirmed the district court's conclusion that COP's and ANR's appeals were moot under § 363(m).[75]

---

[71] *Hazelbaker v. Hope Gas, Inc. (In re Rare Earth Minerals)*, 445 F.3d 359, 363 (4th Cir. 2006).

[72] *In re C.W. Mining Co.*, 740 F.3d at 555 (citation and internal quotation marks omitted); *see also In re Rare Earth Minerals*, 445 F.3d at 363 ("Where a sale of a bankrupt's assets has not been stayed, an appeal challenging the sale's validity is moot because the court has no remedy that it can fashion even if it would have determined the issues differently.") (citation and internal quotation marks omitted).

[73] Docket No. 1558 in Case No. 08-20105, at 12; Docket No. 1574 in Case No. 08-20105, at 7; *see also In re C.W. Mining Co.*, 740 F.3d at 553-54 ("After reviewing the sale, the bankruptcy court issued an order finding that Rhino was a good faith purchaser and entitled to the protection of § 363(m).").

[74] *In re C.W. Mining Co.*, 740 F.3d at 555.

[75] *Id.* at 557, 564. The Tenth Circuit also addressed COP's and Hiawatha's challenge to the sale of the Bear Canyon Mine to Rhino. The court noted that "because neither COP nor Hiawatha requested a stay of the sale order, § 363(m) forecloses any remedy that would affect the validity of the trustee's sale." *Id.* at 564-65 (citation and internal quotation marks omitted).

Because COP and ANR could not pursue their appeals of the Interpretation Order and

Sale Orders,[76] they argue that they have been deprived of a full and fair opportunity to litigate the

issues in those orders. In support of their argument, COP and ANR rely on the proposition that

"[c]ontemporary principles of collateral estoppel strongly militate against giving an unreviewable

judgment preclusive effect."[77] To put it another way, "[a] number of courts have . . . [held] that

the lack of opportunity to appeal an issue establishes that there has not been a full and fair

opportunity to litigate it and that, as a result, issue preclusion should not be applied."[78] The Court

has no disagreement with that principle, but concludes that it is inapplicable in this case because

COP and ANR did have an opportunity to appeal.

This case is distinguishable from *Kircher* and *Bell*, where the relevant parties lacked the

opportunity to appeal. *Kircher* involved the application of 28 U.S.C. § 1447(d), which bars

appellate review of an "order remanding a case to the State court from which it was removed"

where the remand is based on "a defect in removal procedure or lack of subject matter

jurisdiction."[79] And *Bell* addressed the question of "whether issue preclusion may be applied to

---

[76] Although the Interpretation Order did not authorize the sale of the Bear Canyon Mine to Rhino, it still received the protection of § 363(m) because the Sale Orders depended on the interpretive foundation it established. *See In re C.W. Mining Co.*, 740 F.3d at 555 ("[Section] 363(m)'s effect is not limited to appeals of the sale order itself where . . . the sale order depends on the other orders on appeal. If these other orders are reversed or modified, the sale order would be effectively 'modified' as well, which is contrary to § 363(m)'s text.").

[77] *Kircher v. Putnam Funds Trust*, 547 U.S. 633, 647 (2006) (quoting *Standefer v. United States*, 447 U.S. 10, 23 (1980)).

[78] *Bell v. Dillard Dept. Stores, Inc.*, 85 F.3d 1451, 1456 (10th Cir. 1996).

[79] *Kircher*, 547 U.S. at 640.

litigants . . . who, because they ultimately prevail at trial, do not have an opportunity to appeal adverse rulings on pretrial motions."[80] Here, by contrast, COP and ANR were not prevented from appealing the Interpretation Order or the Sale Orders. Although § 363(m) acts to deny appellate review of a sale order where the appeal would affect the validity of the sale, that subsection expressly permits an appeal if the appellant obtains a stay pending appeal.[81] That exception offers the opportunity to appeal and separates § 363(m) from other statutes, such as 28 U.S.C. § 1447(d), that provide no such opportunity.

COP and ANR had the opportunity to appeal the Interpretation Order and Sale Orders by seeking a stay pending appeal. It is undisputed that COP and ANR failed to request a stay of the Sale Orders pending appeal, which rendered their eventual appeals moot. But their failure to pursue a stay pending appeal does not mean they were deprived of a full and fair opportunity to litigate the issues in the Interpretation Order and Sale Orders. To the contrary: They had the opportunity but simply did not pursue it. The record makes clear that COP and ANR had the ability to seek appellate review of the Interpretation Order and Sale Orders in the prior proceedings, and the Court concludes that they had a full and fair opportunity to litigate the issues decided by those orders. Accordingly, the last element of collateral estoppel is satisfied.

---

[80] *Bell*, 85 F.3d at 1454.

[81] *See In re Rare Earth Minerals*, 445 F.3d at 363 ("Nor . . . does [§ 363(m)] preclude the possibility of an appeal. It simply requires that the claimant request, and be granted, a stay of the sale pending appeal.").

## IV. CONCLUSION

This Court's prior orders set the standard for Rhino when it comes to compliance with the Coal Operating Agreements. COP and ANR did not like how Rhino chose to conduct operations at the Bear Canyon Mine after Rhino purchased it and amended the R2P2, and COP and ANR have not changed their perspective appreciably on the matter in the intervening years. The issues COP and ANR want to litigate through their Amended Counterclaims are the same as those they raised—and the Court decided—in connection with the sale of the Bear Canyon Mine. Accordingly, COP's and ANR's Amended Counterclaims are precluded by the doctrine of collateral estoppel. In addition, COP and ANR have not raised, either in their response to Rhino's motion for summary judgment or in their Amended Counterclaims, a genuine dispute that Rhino is not substantially complying with a BLM-approved R2P2 or applicable law. Therefore, Rhino is entitled to summary judgment on Count VI of its Second Amended Complaint and on COP's and ANR's Amended Counterclaims. The Court will enter a separate order in accordance with this Memorandum Decision.

-----------------------------------------END OF DOCUMENT----------------------------------------------

**_____ooo0ooo_____**

## DESIGNATION OF PARTIES TO BE SERVED

Service of the foregoing **MEMORANDUM DECISION** shall be served to the parties and in the manner designated below:

**By Electronic Service:**  I certify that the parties of record in this case, as identified below, are registered CM/ECF users and will be served notice of entry of the foregoing through the CM/ECF system:

| | |
|---|---|
| P. Matthew Cox | bankruptcy_pmc@scmlaw.com |
| William F. Dobbs | wdobbs@jacksonkelly.com |
| George B. Hofmann | ghofmann@cohnekinghorn.com, dhaney@cohnekinghorn.com, jthorsen@cohnekinghorn.com |
| David E. Kingston | davidekingston@yahoo.com, cjo@deklawoffice.com |
| David L. Pinkston | bankruptcy_dlp@scmlaw.com |